**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LOUISE VARTANIAN,<br><br>                    Plaintiff,<br><br>         v.<br><br>FIRST   RELIANCE   STANDARD   LIFE<br>INSURANCE COMPANY,<br><br>                    Defendant. | Civil Action No. 24-05096 (GC) (JBD)<br><br>**OPINION** |

**CASTNER, District Judge**

**THIS MATTER** comes before the Court upon Defendant First Reliance Standard Life Insurance Company's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure (Rule) 56 (ECF No. 18), and Plaintiff Louise Vartanian's Motion for Judgment pursuant to Rule 52(a)(1), or in the alternative, Motion for Summary Judgment pursuant to Rule 56 (ECF No. 19). Both parties opposed and replied. (*See* ECF Nos. 27, 28, 33, 34.) The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Defendant's Motion for Summary Judgment is **DENIED**. Plaintiff's Motion for Judgment or alternatively Motion for Summary Judgment is **GRANTED**.

## I.    BACKGROUND[1]

### A.  Procedural Background

Plaintiff ceased working and filed for short-term disability on April 14, 2021. (XSMF

---

[1]      On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the

¶ 18.[2]) Other than an attempt in October or November 2021, Plaintiff did not return to work. (SMF ¶ 9; RSMF ¶ 9.) On November 18, 2021, Plaintiff applied for long-term disability (LTD) benefits after exhausting her short-term disability benefits. (XSMF ¶ 36.) On January 3, 2022, Defendant informed Plaintiff that she qualified for LTD benefits; Plaintiff began receiving payments that same day. (SMF ¶¶ 18-21.) On May 2, 2023, Defendant notified Plaintiff that she no longer qualified for LTD benefits and as a result her life insurance benefit premiums were no longer being paid by Defendant. (*Id.* ¶ 30; XSMF ¶ 69.) Plaintiff submitted a notice of appeal to Defendant's Appeals Department on September 1, 2023. (SMF ¶ 31.) On November 21, 2023, the Appeals Department upheld the decision to terminate Plaintiff's disability benefits. (*Id.* ¶¶ 32, 83.)

Following Defendant's decision, Plaintiff filed a Complaint in this Court on April 16, 2024. (ECF No. 1.) Plaintiff's one-count Complaint alleges wrongful denial of LTD benefits pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B).[3] (ECF No. 1 at 16-17.[4])

---

underlying facts in the light most favorable to the nonmoving party." *Jaffal v. Dir. Newark N.J. Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)).

[2]    Defendant's Rule 56.1 Statement of Material Facts (SMF) is at ECF No. 18-12; Plaintiff's Responsive Statement of Material Facts (RSMF) is at ECF No. 28-1; Plaintiff's Cross-Statement of Material Facts (XSMF) is at ECF No. 20 (*see also* ECF No. 21); and Defendant's Response to Plaintiff's Cross-Statement of Material Facts (XRSMF) is at ECF No. 26. The Administrative Record (AR) is at ECF Nos. 18-2, 18-3, 18-4, 18-5, 18-6, 18-7, 18-8. The parties agree to most of the factual circumstances surrounding this case. (*See* ECF Nos. 18-12, 20, 26, 28-1.)

[3]    The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

[4]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

### B. Statement of Facts Undisputed, or Substantiated by Record Evidence

#### 1. Overview

Plaintiff, who is currently 64 years old, became disabled at 61 years old.  (XSMF ¶ 1.)
Prior to becoming disabled, Plaintiff worked as Executive Director of Corporate/Procurement
Services at Sumitomo Mitsui Banking Corporation (Sumitomo).  (*Id.* ¶ 12; AR 532.)  As Executive
Director, Plaintiff reported directly to the Regional Chief Procurement Officer and managed
Sumitomo's team of procurement operations analysts.  (XSMF ¶ 13.)  Plaintiff's key duties were
to: (1) "Improve vendor/supplier governance and performance management"; (2) "Centralize and
automate back-office procurement, contract management and invoicing operations"; (3) "Reduce
vendor/supplier related legal, regulatory, financial and operational risk to the Firm"; (4) "Drive
significant and sustainable savings across businesses"; and (5) "Maximize visibility and control of
vendor/supplier spend across business and regions."  (*Id.*; AR 665-66 (outlining the scope, primary
responsibilities, and core competencies of Plaintiff's job).)  Plaintiff's job was sedentary and
involved "directing, controlling, or planning activities of others" and "making judgments and
decisions."[5]  (SMF ¶ 16; AR 1121.)

As an employee of Sumitomo, Plaintiff was eligible for coverage under the First Reliance
Standard Group Long Term Disability Policy, number 131215 (LTD Policy).  (XSMF ¶ 2; SMF
¶ 1.)  The LTD Policy "provides income replacement benefits for Total Disability from Sickness
or Injury" to eligible Sumitomo employees.  (SMF ¶ 2.)  Under the terms of the LTD Policy,
"Sumitomo is the plan administrator and has designated Defendant First Reliance Standard Life
Insurance Company . . . as claim fiduciary to evaluate claims and pay benefits under the Policy."

---

[5]     According to the vocational assessment by Defendant, the "general educational development" for Plaintiff's job is "Grades 9-12."  (AR 1120-22.)

(XSMF ¶ 3.)  The LTD Policy also states that Defendant "has the discretionary authority to interpret . . . the insurance policy and to determine eligibility for benefits."  (SMF ¶ 3.)

As relevant here, the LTD Policy states that Defendant "will pay a Monthly Benefit if an Insured . . . submits satisfactory proof of Total Disability to" Defendant.  (*Id.* ¶ 13.)  The LTD Policy defines "totally disabled" and "total disability" as follows:

> (1) during the Elimination Period[6] and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation;
>
>> (a) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her Regular Occupation on a part-time basis or some of the material duties on a full-time basis.  An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period;
>
>> (b) "Residual Disability" means being Partially Disabled during the Elimination Period.  Residual Disability will be considered Total Disability; and
>
> (2) after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of Any Occupation.  We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a full-time basis.

(AR 0010.)  Additionally, the term "regular occupation" is defined as the "occupation the Insured is routinely performing when Total Disability begins"; Defendant will look at the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale.  (SMF ¶ 15.)

---

[6]    "Elimination Period" means "a period of consecutive days of Total Disability, as shown on the Schedule of Benefits page, for which no benefit is payable.  It begins on the first day of Total Disability."  (AR 0009.)

Because of Plaintiff's employment with Sumitomo, she was also eligible for the First Reliance Standard Group Life Insurance Policy, number 161084 (GLI Policy). (*Id.* ¶ 4; XSMF ¶ 4.) Under the terms of the GLI Policy, "Sumitomo is the plan administrator and has designated Defendant as claim fiduciary to evaluate claims and pay benefits under the Policy." (XSMF ¶ 6.) The GLI Policy includes a Waiver of Premium in Event of Total Disability provision that extends the life coverage for an insured who is Totally Disabled. (SMF ¶ 5.) Similar to the LTD Policy, the GLI Policy states that Defendant "has the discretionary authority to interpret . . . the insurance policy and to determine eligibility for benefits." (*Id.* ¶ 6.)

As relevant here, the GLI Policy defines "total disability" to mean "an Insured's complete inability to engage in any type of work for wage or profit for which he/she is suited by education, training or experience." (*Id.* ¶ 38.)

### 2. *Medical Evaluations (pre-LTD filing)*

When Plaintiff ceased working on April 14, 2021, she was complaining of fatigue, cognitive impairments, dizziness, headaches, and numbness and tingling in her face.[7] (XRSMF ¶ 18.) On April 22, 2021, Rajney Monica Bais, M.D., Plaintiff's primary care physician, wrote a sick note to Defendant and asked for Plaintiff to be excused from work until May 10, 2021. (SMF ¶ 8.) On that same day, Dr. Bais completed a Health Care Provider Medical Certification, indicating that Plaintiff was unable to work starting April 14, 2021, due to "persistent" paresthesia and vertigo. (*Id.* ¶¶ 10-11.) The following day, on April 23, 2021, Plaintiff consulted with Board Certified Cardiologist Van-Hong Nguyen, M.D., who noted that approximately three weeks prior,

---

[7] The parties do not dispute Plaintiff's medical history of diabetes mellitus and sarcoidosis, but rather dispute whether Plaintiff experienced these "generalized symptoms" as of April 29, 2023, the final date benefits were paid through. (XSMF ¶ 17; XRSMF ¶ 17.)

Plaintiff had gone to the emergency room with paresthesia of the forehead and chin along with a mental fog.  (XSMF ¶ 19.)

On August 16, 2021, Board-Certified Internal Medicine and Infectious Disease Specialist Susan Levine, M.D., evaluated Plaintiff and noted that Plaintiff was experiencing headaches and neurological symptoms, including "brain fog, post-exertional fatigue and fatigue at rest, shortness of breath, pain in the muscles and joints, sleep problems, diminished attention or concentration, diminished patellar reflexes bilaterally, abnormal gait, abnormal [Romberg] test,[8] fibromyalgia trigger points, and difficulty counting backwards by serial 7's."  (*Id.* ¶¶ 20, 23.)  Plaintiff continued to be treated by Dr. Levine through November 2021, reporting "ongoing fatigue, impaired stamina which limited her daily activities to short periods of time, cognitive difficulties, post exertional malaise, reduced aerobic capacity, weakness joint and muscle pain, and unrefreshing sleep."  (*Id.* ¶ 24.)

On October 25 and 26, 2021, Plaintiff underwent Cardiopulmonary Exercise Testing (CPET)[9] with Betsy Keller, Ph.D.  (*Id.* ¶ 26.)  Based on the CPET, Dr. Keller determined that Plaintiff was "not able to produce sufficient energy to perform sedentary work on a sustained basis without exacerbating her symptoms and her already severe symptoms complex.  Efforts to persist will exacerbate [Plaintiff's] illness symptoms . . . and will worsen over time making it impossible

---

[8]    "A Romberg test (also known as Romberg's sign) is a simple physical test to see if you have balance problems that are related to proprioception — your body's ability to sense your movements and position."  *Romberg Test*, Cleveland Clinic, https://my.clevelandclinic.org/health/diagnostics/22901-romberg-test (last visited September 4, 2025).

[9]    "CPET consists of two monitored tests on a stationary bicycle on two consecutive days. During testing, a patient's cardiac and pulmonary responses are measured according to a specific protocol that measures cardiopulmonary functions including peak oxygen consumption (VO2 peak) and anaerobic threshold."  (XSMF ¶ 27.)

for her to perform a job." (*Id.* ¶ 31.)  Based on Plaintiff's symptoms and results from the CPET, Dr. Levine diagnosed Plaintiff with Myalgic Encephalomyelitis/Chronic Fatigue Syndrome (ME/CFS)[10] and dysautonomia on November 8, 2021.  (*Id.* ¶ 32; AR 0562.)

On November 8, 2021, Plaintiff also underwent neuropsychological testing with Wilfred Van Gorp, Ph.D.  (XSMF ¶ 33.)  Dr. Van Gorp found that Plaintiff was "experiencing impairment in multiple cognitive domains, including attention, verbal fluency, and speed." (*Id.* ¶ 35.)  Dr. Van Gorp also indicated that Plaintiff's "position as Executive Director [for Defendant] required a high degree of cognitive demand, strong oral and written communication skills, multitasking, problem-solving, aggressive deadlines, time-sensitive activities, and frequent interaction with and presentations to senior management," and therefore Plaintiff "is unable to work part-time or full-time."  (*Id.*)

### 3.  *Plaintiff's LTD Claim*

On November 29, 2021, Plaintiff submitted a claim to Defendant for benefits under the LTD Policy.  (SMF ¶ 12.)  Plaintiff's application indicated that the reason for her disability was fatigue, brain fog, facial numbness, body aches, low blood pressure, headaches, light and sound sensitivity, and cognitive deficits.  (XSMF ¶ 36.)  Plaintiff's application also indicated that her illnesses "progressed since April 13, 2021" and that she was struggling "with sitting at [her] computer, standing, walking, using the keyboard, and dealing with [the] flood of information [she] analyzed."  (*Id.* ¶ 37.)  According to Plaintiff, "[s]itting and standing for such long periods and

---

[10]    "ME/CFS is a multi-system illness characterized, in part, by increasing fatigue following minimal exertion, cognitive impairment, and poor recovery from physical and other stressors. . . . [S]ymptom[s] [include] disabling and persistent fatigue following exertion . . .[,] sleep disturbance, pain, and symptoms associated with autonomic dysfunction such as postural orthostatic tachycardia syndrome (POTS), light and sound sensitivity, and/or gastrointestinal distress." (XSMF ¶ 21.)

using [her] fingers and hands has resulted in severe body pain and weakness." (*Id.*)

In support of Plaintiff's LTD claim, Dr. Levine completed an Attending Physician Statement (APS), noting that Plaintiff was disabled due to a primary diagnosis of chronic fatigue syndrome (CFS) and symptoms including severe exhaustion and muscle pain. (*Id.* ¶ 38.)

### 4. *Defendant's Grant and Subsequent Denial of LTD Claim*

On December 7, 2021, Defendant's clinical staff reviewed Plaintiff's medical records and concluded that Plaintiff "lack[ed] work function at [the] date of loss for work up and treatment [of] head pain and neurological symptoms (brain fog, photophobia), fatigue." (*Id.* ¶ 39.) In reviewing Plaintiff's records, the clinical staff noted a "long history of head pain and neurological symptoms," a "positive Romberg," and the CPET which indicated findings of "limited ability to carry out normal daily activities." (AR 0147.)

On January 3, 2022, Defendant informed Plaintiff that her claim for benefits was approved and would "commence after an Elimination Period." (SMF ¶ 18.) Because the elimination period was satisfied, Defendant began issuing disability benefits to Plaintiff. (*Id.* ¶¶ 19-21.)

Shortly after getting approval for benefits, Plaintiff tested positive for COVID-19 and was diagnosed with COVID Pneumonia. (XSMF ¶¶ 41-42.) Plaintiff continued treating with Dr. Levine following her COVID-19 diagnosis. (*Id.* ¶ 43.) During this time, Plaintiff complained of "continued reduced stamina," "poor mental capacity," the "need to rest frequently," fatigue, headaches, congestion, and reduced exercise tolerance. (AR 762-768.) Dr. Levine noted the following during this time: neuro-positive Romberg, crimson crescent, difficulty counting backwards by serial-7's, and evidence of inflammation. (XSMF ¶¶ 44-45.)

On April 11, 2022, Plaintiff submitted an update of her conditions to Defendant and noted that she was having problems getting dressed, experiencing chronic fatigue, difficulty

remembering names, and performing household chores.  (*Id.* ¶ 46.)  On May 6, 2022, Defendant's clinical staff performed a periodic review of Plaintiff's claim and noted that Plaintiff "lacks work function due to chest x-ray evidence of bilateral infiltrates typical of COVID pneumonia."  (SMF ¶ 22.)  The clinical staff also noted Dr. Van Gorp's neuropsychological evaluation from November 8, 2021, and indicated a "mild neurocognitive disorder (verbal intelligence and processing speed below expectation) in the context of" CFS.  (AR 0147-48.)  Defendant subsequently extended Plaintiff's LTD benefits.  (XSMF ¶ 47.)

On May 10, 2022, Defendant recommended that Plaintiff seek social security benefits. (AR 0184.)  The record also indicates that Defendant previously informed Plaintiff about the option of seeking social security benefits in the January 3, 2022 letter awarding disability benefits. (AR 0322.)  In late May 2022, the Social Security Administration (SSA) determined that Plaintiff "became disabled under [SSA] rules on October 19, 2021."[11]  (*Id.* 1125-1128.)  Because Plaintiff began receiving social security benefits, Defendant reduced the amount of LTD benefits in accordance with the LTD Policy.  (*Id.* 0348-52.)

Between June and July 2022, Plaintiff continued to treat with Dr. Levine.  (XSMF ¶ 51.) During this time, Plaintiff continued to complain of similar health issues, and Dr. Levine again indicated ME/CFS, vertigo, and dysautonomia.  (*Id.*; AR 1188-89.)  However, Dr. Levine did not record any objective medical findings in her treatment notes.  (AR 1188-89.)  Also in June 2022, Plaintiff began seeing pulmonologist Elie Mansour, M.D.  (XSMF ¶ 52.)  Plaintiff also underwent a CT scan of the chest, which revealed scattered pulmonary nodules measuring up to 7 millimeters, and prominent lymph nodes in mediastinal region of the chest and lungs.  (*Id.* ¶ 53.)  After seeking

---

[11]    The award letter does not discuss the substance of Plaintiff's claim.  (SMF ¶ 85.)

additional treatment from Drs. Levine and Mansour, Plaintiff submitted another update to Defendant, indicating similar health concerns as previously outlined. (*Id.* ¶ 54.)

On August 17, 2022, Plaintiff underwent a cardiovascular stress test with Dr. Nguyen. (AR 0150.) Plaintiff reported no chest pain during the test, but the test was terminated early due to moderate shortness of breath. (*Id.*) Heart rate and blood pressure were normal. (*Id.*)

On November 9, 2022, Defendant's clinical staff performed a periodic review of Plaintiff's claim and noted that a return to work was unlikely at that time. (XSMF ¶ 57; AR 0278.) As part of this review, the clinical staff reviewed records from Dr. Levine that indicated a "long history of head pain and neurological symptoms (brain fog, photophobia)" and noted that Dr. Levine's treatment notes from June and July 2022 contained "limited or no objective findings." (AR 0149.) The clinical staff also acknowledged Dr. Van Gorp's neuropsychological evaluation from November 8, 2021, and noted findings that Plaintiff suffered from a "mild neurocognitive disorder (verbal intelligence and processing speed below expectation) in the context of" CFS. (*Id.*) The clinical staff also acknowledged Plaintiff's CPET from November 18, 2021. (*Id.*) Defendant continued Plaintiff's benefits.

Between October 2022 and February 2023, Plaintiff continued to treat with Dr. Levine and reported the same health concerns. (XSMF ¶ 58.) During this time, Dr. Levine did not record objective medical findings in her treatment notes pertaining to Plaintiff. (AR 1374-1382.) Also in February 2023, Plaintiff saw Sunit Desai, M.D., Plaintiff's primary care physician. (XSMF ¶ 59; SMF ¶ 26.) Plaintiff reported pain in her hip, weakness in her hand, and stuttering. (XSMF ¶ 59.) Dr. Desai assessed "mast cell activation" with symptoms of stuttering, joint pain, fatigue, vertigo. (AR 1242-45.)

In March 2023, Plaintiff treated with Drs. Levine and Van Gorp. Dr. Levine recorded

Plaintiff's subjective complaints but entered no objecting findings before writing that Plaintiff "remains completely disabled" and "incapable of gainful employment." (SMF ¶ 33.) In fact, for several months, Dr. Levine failed to list findings under the objective heading. (*See* AR 2234-42.) Regarding Dr. Van Gorp, Plaintiff participated in a neuropsychological evaluation on March 13, 2023, "however, at that time the results were unable to be interpreted due to invalid scores on several effort measures." (SMF ¶ 34.)

Also in March 2023, Plaintiff submitted an "Activities of Daily Living Questionnaire" to Defendant. (AR 1357-1364.) Plaintiff indicated that she has difficulty sleeping at night, usually needs to nap throughout the day, and doses off due to chronic fatigue. (*Id.* at 1359.) Plaintiff also indicated that she struggles getting dressed. (*Id.*) However, Plaintiff indicated that she does not use assistive devices to aid with ambulation and that she can prepare simple meals. (*Id.*) Regarding cognitive impairments, Plaintiff indicated that she has difficulty remembering names, dates, and conversations and that she struggles to concentrate for more than a few minutes. (*Id.*) Her cognitive issues, Plaintiff asserted, resulted in her forgetting to eat and her husband reminding her to eat. (*Id.*) As part of the Questionnaire, Plaintiff also indicated that she does drive locally, can travel as a passenger for around 60 miles, and can take public transportation. (*Id.*) However, Plaintiff also indicated that her husband frequently is in the car when she drives and that if she is alone, she uses the GPS to avoid getting lost. (*Id.*) Finally, Plaintiff indicated that she does household work for about an hour daily (with breaks), such as laundry and taking out the trash. (*Id.* at 1360.)

On April 3, 2023, Plaintiff submitted another update of her conditions to Defendant and noted her continued struggles with daily activities, chronic fatigue, pain and numbness in her face, body aches, sound and light sensitivity, and difficulty concentrating. (XSMF ¶¶ 60-61.) On April

21, 2023, Defendant's clinical staff performed another review of Plaintiff's claim by reviewing recent records from Drs. Nguyen, Levine, and Desai.  (SMF ¶¶ 24-26.)  The clinical staff also considered Plaintiff's March 31, 2023 responses to the Activities of Daily Living Questionnaire, noting that Plaintiff "reported that she sits down to get dressed due to balance issues but then noted that she does not use any assistive devices for ambulation" and that Plaintiff drives locally and does housework, including laundry and trash related tasks.  (*Id.* ¶ 27.)

On April 27, 2023, Dr. Levine completed another Attending Physician Form.  (AR 1527-1532.)  On that form, Dr. Levine diagnosed Plaintiff with ME/CFS and Long COVID as a secondary diagnosis.  (*Id.* at 1527.)  Dr. Levine noted similar restrictions as in her prior treatment notes.  (*See id.* 1528-1532.)

On May 2, 2023, Defendant sent Plaintiff a letter, indicating that it was unable to approve benefits under the LTD and GLI policies.  (AR 0380-0384.)  After "review[ing] all of the information in [Plaintiff's] claim file, including (but not limited to) the information provided by Dr. Nguyen, Dr. Levine[,] and Dr. Desai," Defendant determined that Plaintiff "retain[ed] the ability to perform the material duties of her occupation."  (*Id.* at 0381.)  Moreover, Defendant noted that based on its review of Plaintiff's medical records, there was "no clinical findings to support a severity of symptoms to preclude sedentary work function" and that "[w]hile symptoms are noted, there [was] no clinical documentation to support that [Plaintiff was] precluded from sedentary work function or that her symptoms preclude safe sedentary work function."  (*Id.* at 0382.)  And, according to Defendant, "[m]any of [Plaintiff's] complaints [were] self-reported."  (*Id.*)  Of significance, Defendant indicated that its review of Dr. Levine's medical evaluations showed "no objective findings to validate [Plaintiff's] report of symptoms."  (*Id.*)

Defendant also addressed the potential inconsistency in Plaintiff being deemed disabled by

SSA and Defendant's denial of benefits under the LTD Policy:

> While [Defendant] consider[ed] Social Security and other insurers' determinations, they are not binding on [Defendant's] decision as to whether or not [Plaintiff] meets the definition of "Total Disability", as set forth in her Policy. A person's entitlement to each of these benefits may be based upon a different set of guidelines, which may sometimes lead to differing conclusions. In addition, each benefit provider may also be considering different medical evidence in the evaluation of a claim. For example, in her situation, [SSA] did not have the updated medical records of Dr. Nguyen, Dr. Levine[,] and Dr. Desai or other medical and vocational information [Defendant] may have developed in [Plaintiff's] file. If the SSA were to review this report along with the other medical information obtained by [Defendant], they may reach a similar conclusion. In any event, the receipt of [social security benefits] does not guarantee the receipt of LTD benefits or vice versa.

(*Id.*) Defendant's denial of LTD benefits did not address Plaintiff's neuropsychological testing from eighteen months earlier and omitted a discussion of the cognitive requirements and stamina required for Plaintiff's job. (XSMF ¶¶ 66-68.)

Defendant also denied Plaintiff's waiver of life insurance premiums. (*Id.* ¶ 69.) As to the GLI Policy claim, Defendant's clinical staff found that "the information submitted . . . does not change the determination that claimant would be capable of at least sedentary work function." (SMF ¶ 39.)

As relevant here, the May 2, 2023 letter denying benefits notes the following for beneficiaries who choose to appeal an adverse benefits determination:

> You may request review of this determination by submitting your request in writing to:
>
> First Reliance Standard Life Insurance Company
> Quality Review Unit
> P.O. Box 8330
> Philadelphia, PA 19101-8330
>
> This written request for review must be submitted within 180 days of your receipt of this letter. Your request should state any

reasons why you feel this determination is incorrect, and should include any written comments, documents, records, or other information relating to your claim for benefits, including but not limited to any information submitted in conjunction with any claim for Social Security disability or other benefits which you would like us to consider.  Only one review will be allowed, and your request must be submitted within 180 days of your receipt of this letter to be considered.

. . . .

Under normal circumstances, you will be notified in writing of the final determination within 45 days of the date we receive your request for review.  If we determine that special circumstances require an extension of time for processing, you will ordinarily be notified of the decision no later than 90 days from the date we receive your request for review.

(AR 0383.)

### 5.  *Plaintiff's continued treatment*

Following the denial of benefits, Plaintiff continued to seek treatment from Dr. Levine between May and August 2023.  (XSMF ¶¶ 70-72.)  Plaintiff reported similar complaints as previously noted, such as cognitive impairment and fatigue.  (*Id.*)  During this time, Plaintiff also underwent another neuropsychological examination with Dr. Van Gorp and a skin biopsy with neurologist Noah Gilson, M.D.  Dr. Van Gorp concluded that Plaintiff's cognitive issues impaired her ability to work.  (*Id.* ¶¶ 73-76.)  And Dr. Gilson concluded that Plaintiff was experiencing nerve issues which contributed to numbness and paresthesia, but noted normal cognitive findings. (*Id.* ¶ 77; AR 3073-76.)  Dr. Gilson's objective findings included, among others, "memory recall 3/3," "attention span Normal," "speech and language Normal," "recalls current events," and "interpretation of proverb Normal."  (AR 3075.)

On September 1, 2023, Dr. Levine provided a report that noted Plaintiff is still experiencing fatigue and that the results of Plaintiff's recent neurocognitive testing is "a hallmark of patients

with ME/CFS." (XSMF ¶ 78.) As a result, Dr. Levine opined that Plaintiff was medically disabled. (*Id.* ¶¶ 79-80.)

### 6.  *Plaintiff's Appeal*

On September 1, 2023, Plaintiff filed a Notice of Appeal with Defendant's Appeals Department regarding the denial of Plaintiff's LTD benefits and termination of the waiver of life insurance premiums. (*See* AR 2348-2417.) On September 11, 2023, Defendant's clinical staff performed a pre-approval review and concluded that "[b]ased on the review of updated medical records and from a physical perspective, while [Plaintiff's] report of daily weakness and fatigue is noted and appreciated, there was no clinical evidence from treating providers that would preclude at least sedentary work function." (SMF ¶ 68.) On September 14, 2023, an appeal review was conducted internally, and a recommendation was made for an independent opinion from an internist "to better determine if there [was] evidence [that Plaintiff was] impaired from sedentary work function," and "[a] psychiatric contribution [was] suggested." (*Id.* ¶ 69.) The review was to determine whether Plaintiff was entitled to benefits as of April 29, 2023. (*Id.* ¶ 32.)

On October 3, 2023, Joseph Palermo, D.O., a Board-Certified Internist, reviewed Plaintiff's medical records and delivered a report. (*Id.* ¶ 70.) Dr. Palermo reviewed medical records from Drs. Nguyen, Maniar, Bais, Van Gorp, Desai, Gilson, and Levine and provided a narrative summary of the records. (*Id.* ¶¶ 71-76; AR 3189-3199.) Dr. Palermo then answered several questions that were posed to him by Defendant. Regarding the question, "[b]ased on your review of medical information and call(s), does the medical information support functional limitations sufficient to preclude working from 04/29/2023 ongoing?", Dr. Palermo determined that "[b]ased on [his] review of medical information, the medical information does not support any functional limitations sufficient to preclude working from 04/29/2023 ongoing" and that "[a]

15

normal exertional level is possible." (AR 3194-3195.) Dr. Palermo based this conclusion on Plaintiff's underlying medical records from Plaintiff's various providers. (*Id.* at 3195.)

As to Dr. Levine, Dr. Palermo rendered the following opinion:

> This physician is the only medical practitioner opining impairment and the medical necessity of restrictions. Her notes appear to outline multiple claimant symptoms without documented objective abnormalities. The notes do not specify how she meets clinical criteria for ME/CFS, as no examination was performed and there is no documentation of any objective findings of abnormal vital signs, dysautonomia or functional physical impairment. Dr. Levine never appeared to perform a comprehensive mental status or cognitive exam before documenting disability. Her documentation does not support any medically necessary restrictions. The medical record as submitted includes visits and evaluations by multiple other physicians, none of whom opine restrictions or the presence of a functional physical impairment.

(*Id.* at 3196.)

Regarding Drs. Nguyen, Maniar, Bais, Desai, and Gilson, Dr. Palermo found that these physicians did not document "functional physical impairment" or cognitive or neurological restrictions in their respective medical documentation. (*Id.* 3196-98.)

With respect to Dr. Van Gorp, Dr. Palermo determined that Dr. Van Gorp's report "indicate[d] that [Plaintiff] performed within the average range of executive functioning," "did demonstrate clinically significant depression scores," "demonstrated a range from low average to high average for learning and memory," demonstrated low attention scores when such scores had been previously normal, and demonstrated "low average" processing speed. (*Id.* at 3197.) Dr. Palermo also recognized Dr. Van Gorp's opinion that Plaintiff had "impaired overall cognitive functioning." (*Id.*)

On November 7, 2023, Dr. Palermo prepared an addendum report to address additional records supplied by Plaintiff's counsel, which included supplemental submissions from Dr.

Levine.  (*Id.* at 3254-56.)  In concluding that his opinion was unchanged, Dr. Palermo found the

following:

> Dr. Levine now indicates that [Plaintiff] met the Institute of Medicine Committees criteria.  Criteria one and two describe profound fatigue, decreased activity level and unrefreshing sleep.  These are symptoms related by the claimant and are otherwise unsubstantiated.
>
> Subsequent notes state ME/CFS and dysautonomia without further detail.  There is no detailed discussion of the [Plaintiff's] symptoms, abnormalities with vital signs, physical abnormalities, or any lab testing that supports these diagnoses.  No functional impairment is documented.  No restrictions are noted.  It was my determination that the documented examinations did not demonstrate clinical evidence of dysautonomia, cognitive dysfunction, or any other functional physical impairment.  Whether ME/CFS and dysautonomia are present, is one issue, but there is no documented objective evidence that any diagnosis is causing a disability.
>
> With regards to cognitive dysfunction with impaired memory and diminished concentration, it is my opinion that Dr. Levine did not test for this or document it in her notes.  [Dr. Van Gorp] noted variable findings of cognition, but no other physician, including Dr. Levine and the neurologist documented evidence of cognitive dysfunction.  Dr. Levine never appeared to perform a comprehensive mental status or cognitive exam before documenting disability.  Her documentation does not support any medically necessary restrictions.

(AR 3255.)

In addition to Dr. Palermo, on October 6, 2023, Brandon Erdos, M.D., a Board-Certified

Psychiatrist, reviewed Plaintiff's medical records.  (SMF ¶ 77.)  Dr. Erdos reviewed the medical

records from Drs. Van Gorp, Desai, Levine, and Gilson and provided a narrative summary of these

records.  (AR 3182-87.)  Dr. Erdos then answered several questions that were posed to him by

Defendant.  Regarding the question, "[b]ased on your review, is there medical data to substantiate

the presence of subjective complaints as of 04/29/2023 and ongoing?", Dr. Erdos provided the

following response:

> Based on a comprehensive review of all available data, the medical findings do not substantiate the presence of subjective complaints as of 04/29/2023 and ongoing. [Plaintiff] reportedly states that she has anxiety as a psychiatric condition and has indicated in a 07/23/2023 evaluation the symptoms began when she went on disability because of extreme stress at work. While [Plaintiff] self-reports anxiety, the available medical records do not demonstrate or support the presence of acute levels of anxiety, nor other psychiatric symptoms, that would result in functional limitations from 04/29/2023 and ongoing. Mental status examination findings when documented in the available medical records are unremarkable and within normal limits. [Plaintiff] is noted to be taking Xanax as needed.

(*Id.* at 3185.) Moreover, Dr. Erdos concluded that there was "no indication of impairment associated with psychiatric conditions during the time period in question," "mental status examination findings when documented [were] unremarkable and within normal limits," and "the available medical records [did] not support [Plaintiff] as impaired from work in a previous job site, nor [was] there indication [Plaintiff] would have difficulty performing her occupation for a different employer or at a different location as of 04/29/2023 and ongoing." (*Id.* at 3185-86.)

On November 7, 2023, Dr. Erdos prepared an addendum report to address additional records supplied by Plaintiff's counsel, which included supplemental submissions from Drs. Levine and Van Gorp. (*Id.* at 3250-51.) In concluding that his opinion was not altered, Dr. Erdos found the following:

> The attached medical records as part of this addendum review does not alter this reviewer's initial determination. The available medical records identified and supported that [Plaintiff] has fatigue and cognitive impairments associated with the physical health conditions of chronic fatigue syndrome and long COVID. These findings do not demonstrate evidence of psychiatric conditions resulting in functional impairments. Therefore, the additional records provided do not warrant a change to the prior determination completed by this reviewer on 10/06/2023. It remains the outcome of this review that no impairment is supported for the

18

timeframe of 04/29/2023 and ongoing.

(*Id.*)

On November 21, 2023, Defendant upheld the decision denying LTD benefits and terminating the waiver of insurance premiums.[12]  (SMF ¶ 83.)  Relying on documentation in Plaintiff's file, medical records from Plaintiff's physicians, and the reports of Drs. Palermo and Erdos, Defendant's Appeals Department stated the following:

> While we acknowledge that [Plaintiff] is continuing to receive treatment for several medical conditions, documentation on file does not support ongoing impairment which supports a lack of fulltime consistent work function.  Cognitive and neurological exams appear as normal, and medical information on file does not document functional limitations which preclude work function.  Therefore, in conclusion, based on the medical records, the independent physician's review and other information within [Plaintiff's] claim file, we determined that her condition was not of such a severity to render her unable to perform the material duties of [her] Regular Occupation on a full-time basis beyond April 29, 2023.  As such, this claim will remain closed.

> In addition, we also reviewed your client's Waiver of Premium claim and determined that our original determination was appropriate.

> . . . .

> [B]ased on the medical records and other information contained in [Plaintiff's] file, it does not appear the [Plaintiff's] condition was . . . of such a severity to render her unable to perform the material duties of any type of work for wage or profit as of April 29, 2023.  In other words, [Plaintiff] does not meet the definition of Total Disability, as set forth in the policy and benefits must be terminated on [Plaintiff's] Waiver of Premium claim as well.

(AR 0433-0434.)

This suit followed.

---

[12]    In the letter denying Plaintiff's benefits, Defendant acknowledged SSA's decision to award social security benefits but provided the same reasons as set forth in the May 2, 2023 letter addressing any potential inconsistencies in the respective determinations.  (AR 0434.)

## II.   <u>LEGAL STANDARD</u>

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The Court must grant summary judgment if any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 616 (D.N.J. 2023) ("In the face of a properly supported summary judgment motion, the nonmovant's burden is rigorous: the party 'must point to concrete evidence in the record'—mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment." (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995))). "[I]nferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983).

The standard is the same in the context of cross-motions for summary judgment. *Auto-Owners Ins.*, 835 F.3d at 402. "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Id.* (citing 10A

Charles Alan Wright et al., *Federal Practice & Procedure* § 2720 (3d ed. 2016)).

## III.  <u>DISCUSSION</u>

As a threshold matter, the parties dispute which standard of review this Court should apply—*de novo* or arbitrary and capricious.  (ECF Nos. 18-13 & 19-1.)

As to the merits, Defendant argues that Plaintiff bears the burden to prove that she was totally disabled and entitled to benefits on April 29, 2023.  (ECF No. 18-13 at 15-38.)  Defendant claims that Plaintiff failed to meet that burden based on the following: (1) Dr. Levine has not proven that Plaintiff is physically disabled as of April 29, 2023; (2) no other medical doctor, other than Dr. Levine, has claimed that Plaintiff is physically disabled as of April 29, 2023; (3) independent physicians confirmed that Plaintiff is not disabled; (4) Dr. Van Gorp's evaluations do not prove that Plaintiff is cognitively impaired; and (5) an award of social security benefits is not determinative of disability.  (*Id.*; ECF No. 33.)

Plaintiff argues that the evidence establishes that Plaintiff is disabled from her own or any other occupation under the terms of the LTD and GLI policies based on her diagnosis of ME/CFS and Long Haul COVID-19.  (ECF No. 19-1 at 18, 20.)  Plaintiff asserts that, because of her disability, Defendant's adverse benefit determination was unlawful under any standard of review and argues the following in support: (1) Defendant failed to properly analyze how Plaintiff can perform the cognitive duties of her own or any occupation; (2) Defendant's denial of benefits improperly disregards the opinions of treating physicians; (3) Defendant's denial of benefits "is the product of a self-serving, selective review of the evidence"; and (4) Defendant did not properly consider Plaintiff's SSA award.  (*See* ECF No. 19-1 at 18-36; ECF No. 34.)  Further, Plaintiff argues that if the Court concludes that Defendant's termination of benefits was improper, that retroactive reinstatement of benefits is the proper remedy.  (ECF No. 19-1 at 36-7 (quoting *Miller*

*v. Am. Airlines, Inc.*, 632 F.3d 837, 857 (3d Cir. 2011)).)

### A. Standard of Review

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When an employee welfare benefit plan, as here, "grants its administrator . . . discretionary authority, '[t]rust principles make a deferential standard of review appropriate,'" and a denial is reviewed "under an 'arbitrary and capricious' standard." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120-21 (first quoting *Firestone*, 489 U.S. at 111; then quoting *Orvosh v. Program of Grp. Ins. for Salaried Emps. of Volkswagen of Am., Inc.*, 222 F.3d 123, 129 (3d Cir. 2000)).[13]

Plaintiff does not dispute that the policies at issue contain the language necessary to confer such discretion on Defendant. (ECF No. 19-1 at 7.) Nevertheless, Plaintiff argues that a *de novo* review is appropriate when a defendant fails to issue a timely benefit determination. Plaintiff alleges that Defendant exceeded the allotted 45-day window to issue a determination of her benefits. (*Id.* at 8-10.) In opposition, Defendant asserts that its decision was timely because Defendant properly sought an extension of the 45-day timeframe, and that any delay in rendering a benefits decision is attributable to Plaintiff for improperly submitting her appeal. (ECF No. 27 at 10-17.)

---

[13]    Although the arbitrary-and-capricious standard is sometimes referred to as an "abuse of discretion" standard, the United States Court of Appeals for the Third Circuit has underscored "that '[i]n the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical.'" *Fleisher*, 679 F.3d at 121 n.2 (quoting *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 n.2 (3d Cir. 2011)); *accord Noga v. Fulton Fin. Corp. Emp. Benefit Plan*, 19 F.4th 264, 276 (3d Cir. 2021) (noting that the arbitrary-and-capricious and abuse-of-discretion standards of review are essentially identical in the ERISA context).

Pursuant to applicable ERISA regulations, an insured has "180 days following receipt of a notification of an adverse benefit determination within which to appeal the determination." 29 C.F.R. § 2560.503-1(h)(3)(i); 29 C.F.R. § 2560.503-1(h)(4) (indicating that the 180-day requirement applies to plans providing disability benefits). Following a timely appeal, "the plan administrator shall notify a claimant . . . of the plan's benefit determination on review within a reasonable period of time, but not later than [45] days after receipt of the claimant's request for review by the plan." 29 C.F.R. § 2560.503-1(i)(1)(i) *as modified by* § 2560.503-1(i)(3)(i) (noting that "claims involving disability benefits (whether the plan provides for one or two appeals) shall be governed by paragraph (i)(1)(i) of this section, except that a period of 45 days shall apply instead of 60 days for purposes of that paragraph"). This is so "unless the plan administrator determines that special circumstances (such as the need to hold a hearing, if the plan's procedures provide for a hearing) require an extension of time for processing the claim." *Id.* "If the plan administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial [45]-day period," and "[i]n no event shall such extension exceed a period of [45] days from the end of the initial period." *Id.*

Accordingly, "in the case of the failure of a plan to establish or follow claims procedures consistent with the[se] requirements . . ., a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a)." *Id.* § 2560.503-1(l)(1)-(2)(i). However, "claims for disability benefits will not be deemed exhausted based on de minimis violations that do not cause, and are not likely to cause, prejudice or harm to the claimant" as long as "the plan demonstrates that the violation was for good cause or due to matters beyond the control of the plan and that the violation

occurred in the context of an ongoing, good faith exchange of information between the plan and the claimant." *Id.* § 2560.503-1(l)(2)(ii).

While it is undisputed that Plaintiff submitted her appeal on September 1, 2023, the parties dispute whether Defendant received the appeals package on September 1 or September 8, 2023. (*See* ECF No. 27 at 12; ECF No. 34 at 6-7.)  The date Defendant received the appeals package is relevant because Defendant invoked the 45-day extension on October 18, 2023, which would have been timely only if the appeals package was received after September 1, 2023.  (*See* AR 427.) Nevertheless, the Court need not determine which day Defendant actually received the appeals package or if special circumstances even existed to request an extension, because even if Defendant did improperly invoke an extension beyond the appropriate 45-day window, the Court finds that under the particular facts of this case the alleged procedural violation does not warrant departing from a deferential standard of review.  This is so because, as the United States Court of Appeals for the Third Circuit has held, "notice deficiencies and poor reasoning for the denial of a claim is a factor that can be appropriately considered under the arbitrary-and-capricious standard of review and does not necessitate altering the standard to *de novo* absent a 'severe procedural violation.'"  *Lipani v. Cigna Health & Life Ins. Co.*, Civ. No. 21-16851, 2023 WL 4237061, at *5 (D.N.J. June 28, 2023) (collecting Third Circuit cases).  This is so notwithstanding the 2018 update to the ERISA regulations.  *See Brown v. Covestro LLC Welfare Benefits Plan*, No. 24-1043, 2024 WL 4751199, at *3 (3d Cir. Nov. 12, 2024) ("[T]he updated ERISA regulations do not compel [courts] to apply *de novo* review.")[14]

---

[14]     As the Third Circuit noted in *Brown*, "[t]he Department of Labor acknowledged that it did not intend the update 'to establish a general rule regarding the level of deference that a reviewing court may choose to give a fiduciary's decision'" and that courts "have continued to evaluate procedural violations under an abuse of discretion standard after the 2018 update."  *Brown*, 2024 WL 4751199, at *3 (quoting Claims Procedure for Plans Providing Disability Benefits, 81 Fed

Here, as made clear from the Administrative Record, Plaintiff submitted, via email and facsimile, over 700 documents in support of her appeal. (*See* AR 2527, 2723, 2495, 2892, 2924, 2027, 2677, 2069, 2793, 2997, 2421.) On September 14, 2023, following an internal appeal review, Defendant sought independent evaluations to better determine whether there was evidence that Plaintiff was impaired from performing sedentary work. (SMF ¶ 69.) Defendant subsequently obtained reports from Drs. Palermo and Erdos on October 3 and 6, 2023. (*Id.* ¶¶ 70, 77.) Less than two weeks after Defendant received both reports, Defendant (1) sent the reports to Plaintiff's counsel, (2) indicated that Plaintiff could provide additional information as part of her appeal by November 2, 2023, and (3) invoked the 45-day extension. (*See* AR 0426-27.) In response, Plaintiff submitted additional records from Drs. Levine and Van Gorp on October 23, 2023. (XSMF ¶ 93.) Defendant rendered its decision denying benefits on November 21, 2023. (AR 0429.) To the extent Defendant violated any procedural requirements, such violation was not "severe" because there is no evidence in the record, nor does Plaintiff argue, that Plaintiff was prejudiced or harmed by any delay. *See Becknell v. Severance Pay Plan of Johnson & Johnson & U.S. Affiliated Companies*, 644 F. App'x 205, 212-13 (3d Cir. 2016) (noting that while it "is not ideal in terms of promoting the interests of eligible employees" under benefits plans, the plaintiff failed to advance any reason that the defendant's "delayed response prejudiced or otherwise harmed his appeal," and further finding that the procedural violation was not severe because the plaintiff was not prejudiced, as his initial claim was timely denied and the appeal denial was consistent with the initial denial); *Venusti v. Horizon Blue Cross & Blue Shield of N.J.*, Civ. No. 20-714, 2021 WL 2310095, at *5 (D.N.J. June 7, 2021) (finding the "[p]laintiff's argument that

---

Reg. 92316, 92327 (Dec. 19, 2016), and then citing *Noga v. Fulton Fin. Corp. Emp. Benefit Plan*, 19 F.4th 264, 276 (3d Cir. 2021))).

[the defendant's] noncompliance with ERISA's claim procedure warrants *de novo* review . . . unavailing"); *Cohen v. Retail, Wholesale & Dep't Store Int'l Union & Indus. Pension Plan*, Civ. No. 18-1430, 2019 WL 2357584, at *6-7 (E.D. Pa. June 4, 2019) (finding that the defendant's "untimely notice of its decision to deny his appeal for normal retirement benefits" was not a severe procedural violation).

The Court further finds unavailing Plaintiff's reliance on *Gritzer v. CBS, Inc.*, 275 F.3d 291 (3d Cir. 2002), *Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*, 819 F.3d 42 (2d Cir. 2016), and *Fessenden v. Reliance Standard Life Ins. Co.*, 927 F.3d 998 (7th Cir. 2019), in support of her argument that *de novo* review is appropriate.[15]  (*See* ECF No. 19-1 at 10-15.)  In *Gritzer*, the Third Circuit applied a *de novo* review despite unambiguous plan language which conferred discretion to the plan administrator, because the plan administrator "never made any effort to analyze [the plaintiffs'] claims much less to advise [the plaintiffs] of what that analysis [revealed] until after" the plaintiffs filed suit in federal court.  *Gritzer*, 275 F.3d at 295.  In other words, the Third Circuit found that the administrator simply provided no reason for the denial that a court could defer to.  *Id.* at 295-96; *see Brown*, 2024 WL 4751199, at *2 (noting that under *Gritzer*, *de novo* review applies "if a claims administrator possesses discretionary authority but did not exercise that discretion, such as when the administrator provides no reason for the denial").

In *Halo*, the Second Circuit held that even when a plan grants the administrator discretion, it may be appropriate to apply a *de novo* standard of judicial review if the denial of a claim fails to comply with the minimum regulatory requirements set forth by the Department of Labor, unless the administrator can show it had established procedures in full conformity with the regulations

---

[15]    Plaintiff also cites to out-of-circuit district court decisions.  (*See* ECF No. 34 at 8-9.) Similarly, the Court finds those decisions to be unpersuasive as they are non-binding and inconsistent with Third Circuit precedent.

and the failure to comply was inadvertent and harmless.  819 F.3d at 45, 55-58.  But as this Court observed in *Lipani*, no "court in [the Third] Circuit [has] follow[ed] *Halo's* approach," there is "no record of the Third Circuit adopting the approach," and "the one district court to consider [*Halo*] chose not to do so."  *Lipani*, 2023 WL 4237061, at *5.  In the approximately two plus years since *Lipani*, the Court finds the same to be true.

As to *Fessenden*, the Seventh Circuit held that "[w]hen a plan administrator commits a procedural violation . . . it loses the benefit of deference and a *de novo* standard applies. . . .  [A] deadline is a bright line . . . and a hard-and-fast obligation . . . is not entitled to deference."  *Fessenden*, 927 F.3d at 999-1000.  But similar to *Halo*, the Court is unaware of any court in the Third Circuit adopting *Fessenden's* holding, and there is no indication that the Third Circuit has adopted such an approach.[16]

Moreover, the Court finds that *Fessenden* is inconsistent with Third Circuit precedent.  *Compare Fessenden*, 927 F.3d at 1003 n.3, 1006 (noting that there is no exception for missed deadlines after the passing of the 2018 update to the ERISA regulations), *with Brown*, 2024 WL 4751199, at *3 (noting that the Third Circuit still applies a deferential standard of review when confronted with procedural violations even after the 2018 update to the ERISA regulations).  Indeed, "[t]his remains true despite Plaintiff's contention . . . that the post-2018 ERISA regulations require strict adherence and failure to adhere to the regulations results in a *de novo* standard of review."  *Brown v. Covestro LLC Welfare Benefits Plan*, Civ. No. 22-00954, 2023 WL 8481914, at *8 n.3 (W.D. Pa. Nov. 15, 2023), *report and recommendation adopted*, 2023 WL 8481352

---

[16]     To the extent the Third Circuit has even considered *Fessenden*, it is clear that any views taken on that decision were minority views.  *See Rizzo v. First Reliance Standard Life Ins. Co.*, No. 20-1144, 2022 WL 17729430, at *2 n.5 (3d Cir. Dec. 16, 2022) (noting that a judge on the panel did not join a particular part of the decision and further citing to *Fessenden* in support of minority view).

(W.D. Pa. Dec. 7, 2023), *aff'd*, 2024 WL 4751199. As a result, the Court finds that under Third Circuit precedent a *de novo* standard of review is not appropriate in this case. *Becknell*, 644 F. App'x at 211 ("*De novo* review is appropriate, when . . . 'there simply is no analysis or reasoning to which the Court may defer.'" (quoting *Gritzer*, 275 F.3d at 296)).

Therefore, based on the foregoing, the Court will apply the arbitrary and capricious standard of review.[17]

### B. Whether Defendant's Denial of Benefits was Arbitrary and Capricious

"ERISA is a 'comprehensive legislative scheme' designed to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries,' and to do so provides for a variety of standards and regulations for . . . 'welfare plans.'" *Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 449 (3d Cir. 2018) (first quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004); then quoting 29 U.S.C. § 1002(1)). These welfare plans "include[] health insurance plans, and ERISA provides employees covered by such plans with the right to sue" when necessary to obtain promised benefits. *Id.* (citations omitted).

Relevant here, "Section 502(a)(1)(B) of ERISA creates a civil cause of action for a plan participant 'to recover benefits due to him[/her] under the terms of his[/her] plan, to enforce his[/her] rights under the terms of the plan, or to clarify his[/her] rights to future benefits under the terms of the plan.'" *Fleisher*, 679 F.3d at 120 (quoting 29 U.S.C. § 1132(a)(1)(B)). "To assert [such] a claim . . . , a plan participant must demonstrate that 'he or she . . . ha[s] a right to benefits that is legally enforceable against the plan,' and that the plan administrator improperly denied those benefits." *Id.* (quoting *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 574 (3d Cir. 2006)).

---

[17]    To the extent a procedural violation occurred in this case regarding the 45-day window of time for Defendant to provide a benefits decision to Plaintiff, such violation has been considered by the Court and is given minimal weight as Plaintiff was not prejudiced by any minor delay.

A district court must examine a variety of factors when analyzing whether a decision to deny benefits was arbitrary and capricious, including procedural concerns about the decision-making process and structural concerns about conflicts of interest; the factors vary and are "case-specific." *Est. of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009) ("[T]he factors to be considered will be varied and case-specific." (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008))). In the context of procedural concerns, courts may consider several factors, including the following:

> (1) a reversal of a benefits determination without additional evidence; (2) a disregard of opinions previously relied upon; (3) a self-serving selectivity in the use of evidence or reliance on self-serving paper reviews of medical files; (4) a reliance on the opinions of nontreating physicians over treating physicians without explanation; (5) a reliance on inadequate information or incomplete investigation; (6) failure to comply with the notice requirements of Section 504 of ERISA; (7) failure to analyze all relevant diagnoses; and (8) failure to consider plaintiff's ability to perform actual job requirements.

*Moustafa v. Reliastar Life Ins. Co.*, Civ. No. 15-2531, 2016 WL 6662685, at *7 (D.N.J. Nov. 8, 2016) (quoting *Uqdah v. Unum Life Ins. Co. of Am.*, Civ. No. 14-6367, 2015 WL 5572678, at *6 (D.N.J. Sept. 21, 2015)). These factors should be weighed together to determine whether a plan administrator's decision was arbitrary and capricious. *Kosiba v. Merck & Co.*, Civ. No. 98-3571, 2011 WL 843927, at *10 (D.N.J. Mar. 7, 2011) (quoting *Glenn*, 554 U.S. at 117).

As to structural concerns, "[t]here is a presumed structural conflict of interest where, as here, the insurance company both reviews claims and pays out benefits." *Moustafa*, 2016 WL 6662685, at *6 (citing *Est. of Schwing*, 562 F.3d at 526). However, while "the fact that [a defendant] both pays and decides what should be paid is a factor to be considered in applying the

abuse of discretion standard of review," it is not "a determinative factor."[18]  *Fleisher*, 679 F.3d at 122 n.3.

Arbitrary and capricious review "disallows a court from substituting its own judgment for a rational decision made by the plan administrator."  *DeLong v. Aetna Life Ins. Co.*, 232 F. App'x 190, 192 (3d Cir. 2007).  Ultimately, "[a]n administrator's decision is arbitrary and capricious 'if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.'"  *Fleisher*, 679 F.3d at 121 (quoting *Miller*, 632 F.3d at 844).  Substantial evidence is "defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quoting *Soubik v. Dir., Off. of Workers' Comp. Programs*, 366 F.3d 226, 233 (3d Cir. 2004)).  And "[w]hen reviewing an administrator's factual determinations, [courts] consider only the 'evidence that was before the administrator when he made the decision being reviewed.'"  *Id.* at 121 (quoting *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997)); *see also Noga*, 19 F.4th at 275 ("But an ERISA administrative record may not be supplemented with *post hoc* explanations for procedural irregularities.").

---

[18]    While the parties both acknowledge that a structural conflict exists, Plaintiff has failed to point to any facts suggesting that the inherent structural conflict had a direct impact on Defendant's decision to terminate her benefits.  (*See* ECF Nos. 19-1 & 34.)  *See also Moustafa*, 2016 WL 6662685, at *6 (declining to accord weight to the structural conflict of interest because the plaintiff failed to allege facts that such conflict directly impacted the defendant's decision to terminate benefits, and further recognizing that "in the absence of evidence that bias infected the particular decision at issue, [the court] defer[s] to an administrator's reasonable and carefully considered conclusions" (quoting *Post v. Hartford Ins. Co.*, 501 F.3d 154 (3d Cir. 2007))).  Therefore, the Court will accord little weight to the presumed structural conflict of interest.  *See Klass v. Reliance Standard Life Ins. Co.*, Civ. No. 15-6510, 2017 WL 3741005, at *8 (D.N.J. Aug. 29, 2017) (holding that the court would not accord much weight to the plaintiff's structural conflict of interest argument because the plaintiff failed to provide specific support of bias allegations); *see also Prezioso v. Bayer Corp.*, Civ. No. 14-3140, 2018 WL 3054681, at *6 (D.N.J. June 20, 2018) ("The significance of [a] conflict of interest will depend upon the circumstances of the particular case [and] is only important where there is evidence that the benefits denial was motivated or affected by the administrator's conflict.") (citation modified).

Importantly, "[i]t is not [a defendant's] burden to determine the existence of [a] [p]laintiff's disability; it is sufficient that [the defendant] determine, reasonably, that [the] [p]laintiff failed to satisfy his [or her] burden of proof." *Hocheiser v. Liberty Mut. Ins. Co.*, Civ. No. 17-06096, 2021 WL 672660, at *17 (D.N.J. Feb. 22, 2021), *aff'd*, No. 21-1533, 2023 WL 1267070 (3d Cir. Jan. 31, 2023); *Hall v. Reliance Standard Ins. Co.*, Civ. No. 23-20761, 2025 WL 1233203, at *5 (D.N.J. Apr. 29, 2025) (noting that "[a] plaintiff 'retains the burden to prove that [s]he is entitled to benefits." (quoting *Hocknell v. Metro. Life Ins. Co.*, 276 F. Supp. 3d 292, 296 (D.N.J. 2017))).

To determine whether Defendant's decision to terminate Plaintiff's benefits was arbitrary and capricious, the Court will review the relevant procedural factors at issue in this case.

### 1. *Termination of Benefits*

In support of its decision to reverse the initial finding that Plaintiff was disabled, Defendant argues that no medical provider, other than Dr. Levine, has claimed that Plaintiff is physically disabled and incapable of performing her job, and therefore Defendant was justified in terminating Plaintiff's benefits from April 29, 2023, onward. (ECF No. 18-13 at 17-27.) Defendant also argues that Plaintiff's treating physicians, specifically Dr. Van Gorp, do not prove that Plaintiff suffers from a cognitive disability, and therefore Defendant was also justified in terminating Plaintiff's benefits on this basis as well. (*Id.* at 32-37.) To the contrary, Plaintiff argues that she has met her burden to show that she was disabled as of April 29, 2023, under her own or any other occupation under the terms of the LTD and GLI policies based on, for example, medical records from Drs. Levine and Van Gorp. (ECF No. 19-1 at 18-21, 27-34.)

It is well established that when the terms of a benefits plan require proof of a continuing disability, a plan administrator may terminate benefits if the claimant fails to provide the necessary proof of disability. *See Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 46 (3d Cir. 1993).

Indeed, payment of "benefits does not operate as an estoppel such that [a plan administrator] can never terminate benefits." *Miller*, 632 F.3d at 849. However, "[a]n administrator's reversal of its decision to award a claimant benefits without receiving any new medical information to support this change in position is an irregularity that counsels towards finding an abuse of discretion." *Id.* at 848; *Connor v. Sedgwick Claims Mgmt. Servs.,* 796 F. Supp. 2d 568, 586 (D.N.J. 2011) (noting that administrator's "inconsistent treatment" of facts should be viewed with "suspicion"). "[A] plan administrator must, [therefore], base a decision to terminate benefit payments on some form of new evidence." *McCann v. Unum Provident*, Civ. No. 11-3241, 2013 WL 1145422, at *12 (D.N.J. Mar. 18, 2013). As a result, when determining whether a plan administrator improperly terminated benefits, courts must focus "on the events that occurred between the conclusion that benefits were owing and the decision to terminate them" and "must examine the administrative record to determine what, if any, new evidence was considered by the plan administrator." *Id.* (first quoting *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 590 (8th Cir. 2002), and then citing *Miller*, 632 F.3d at 849)). Importantly, "in the absence of any meaningful evidence to support a change in position, [a plan administrator's] abrupt reversal is cause for concern that weighs in favor of finding that its termination decision was arbitrary and capricious." *Miller*, 632 F.3d at 849; *see Sivalingam v. Unum Life Ins. Co. of Am.*, Civ. No. 09-4702, 2011 WL 1584055, at *9 (E.D. Pa. Apr. 26, 2011) ("Generally, a plan administrator reversing position and terminating benefits based on information long within its possession is an irregularity that counsels towards finding an abuse of discretion.") (citation modified).

Here, Defendant determined that Plaintiff was disabled on December 7, 2021, and advised Plaintiff of its determination on January 3, 2022. (*See* AR 0147, 0229-30, 0321-23.) Defendant informed Plaintiff that she was entitled to disability benefits because "it appear[ed] that [she had]

met the group policy's definition of Total Disability."  (AR 0321-23; *see* AR 0147, 0229-30, 0321-23 (noting "that the [Plaintiff] lacks work function at date of loss for work up and treatment head pain and neurological symptoms (brain fog, photophobia), fatigue").)  Plaintiff was advised that her continued receipt of benefits was conditioned on her ongoing ability to meet the policies' definition of "Total Disability" and that Defendant would conduct an investigation to ensure Plaintiff continued to meet the eligibility requirements.  (AR 0322.)  From January 3, 2022, through April 2023, Plaintiff continued to provide medical records to Defendant.  On May 2, 2023, Defendant notified Plaintiff that it formally terminated her benefits.  (*Id.* at 0380-0384.)  In the notice of termination, Defendant indicated that based on its "review of medical records[,] there were no clinical findings to support a severity of symptoms to preclude sedentary work function," and "[w]hile symptoms are noted, there is no clinical documentation to support that [Plaintiff] is precluded from sedentary work function or that her symptoms preclude safe sedentary work function."  (*Id.* at 382.)  Defendant's decision was based on its review of medical records from Drs. Levine, Desai, and Nguyen and Plaintiff's 2023 Activities of Daily Living Questionnaire.  (*Id.* at 0380-0384.)

The Court finds that Defendant's reversal of its decision to award benefits was arbitrary and capricious because the record does not include any new, meaningful evidence to support a change in position, and because Defendant's decision is not supported by substantial evidence. *Miller*, 632 F.3d at 849.  As to Plaintiff's physical disability, Defendant found that while Dr. Levine "assessed [Plaintiff] with chronic fatigue syndrome, dysautonomia, sarcoidosis and fibromyalgia," Dr. Levine made "no objective findings to validate her report of symptoms."[19]  (AR

---

[19]     Under Third Circuit precedent, Defendant is not permitted to require objective medical evidence for LTD benefits based on CFS.  *See Nichols v. Verizon Commc'ns, Inc.*, 78 F. App'x 209, 212 (3d Cir. 2003) (recognizing that under *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433,

0381.)  But this finding appears to directly contradict Dr. Levine's treatment records from 2021 and 2022 in which she explicitly listed objective findings and made clear assessments of physical impairments.  (*See, e.g.*, *id.* at 539-41, 562-66, 762-68, 1383.)    And despite Defendant's acknowledgment that Dr. Levine did not always list objective findings in her treatment notes, Defendant continued to approve Plaintiff's disability benefits based on the full scope of Dr. Levine's medical treatment.  (*See, e.g.*, *id.* at 0149 (noting that Dr. Levine's treatment notes from June and July 2022 contained "limited or no objective findings" but continuing benefits in November 2022).)  To now decide that Dr. Levine's records were insufficient because she did not list objective findings, despite these same records reporting similar if not identical assessments of Plaintiff's physical disability, is the kind of scenario that the Third Circuit has expressed concern over.  *See Miller*, 632 F.3d at 848-49 (finding that the plaintiff's treating physician's more recent records were not new because such records provided the same kind of assessment as the treating physician's older medical records that were sufficient to initially justify a disability finding); *Connor*, 796 F.Supp.2d at 587 (finding that the information the defendant relied on to terminate the plaintiff's benefits was the same type of documentation the defendant utilized to support a disability finding in March 2007 and December 2007).  As a result, the Court does not find that Dr. Levine's more recent medical records from October 2022 to February 2023, provided new,

---

442-43 (3d Cir. 1997), "it was arbitrary and capricious for a plan to require objective evidence of the etiology of CFS, when it is widely recognized that there is no conclusive laboratory test for CFS").  However, it is reasonable for a plan to ask a claimant to provide objective evidence demonstrating the existence of a claimant's symptoms.  *Id.*  In other words, a plan may deny a claimant disability benefits if the claimant fails to provide objective evidence that the claimant's conditions limited functional capabilities such that claimant is disabled under the policy.  *See Klass*, 2017 WL 3741005, at *11.  "The distinction, therefore, is between requiring objective proof that [a claimant] has the particular conditions diagnosed and requiring objective proof that such conditions render [the claimant] unable to perform the functions of [the claimant's] occupation." *Id.*

meaningful evidence to justify terminating Plaintiff's benefits.

Moreover, Drs. Desai and Nguyen's records also do not contain any new, meaningful evidence to support a reversal of benefits. Despite acknowledging that Dr. Desai determined that Plaintiff suffered from mast cell activation with symptoms of stuttering, joint pain, fatigue, and vertigo, consistent with Plaintiff's diagnosis of ME/CFS, there was nothing more noted in Dr. Desai's February 2023 records to support Defendant's decision. (AR 0381-82.) As to Dr. Nguyen, Plaintiff's cardiovascular stress test indicated normal findings overall. However, there is no explanation by Defendant as to how this single test, in light of the overwhelming objective evidence in Plaintiff's records dating back to 2021, rises to the level of substantial evidence that would justify the decision to terminate Plaintiff's benefits. Further, to the extent the medical records from Drs. Desai and Nguyen are "new," the Court finds that such records are not meaningful to justify terminating Plaintiff's benefits. *See Kosiba*, 2011 WL 843927, at \*16-17 (noting that the new medical information was not meaningful, and finding that "in the absence of meaningful new evidence, . . . [the] [d]efendants' reversal of LTD benefits weigh[ed] in favor of finding its termination decision was arbitrary and capricious").

Defendant's determination was also based on Plaintiff's March 2023 Activities of Daily Living Questionnaire. (AR 0382.) In support of its decision, Defendant found that Plaintiff "does not use any assistive devices for ambulation," "drives locally," "does household work of laundry and trash," and "reads and watches TV for 3-4 hours a day." (*Id.*) While Plaintiff does make these notations in her Questionnaire, the Questionnaire also indicates that Plaintiff suffered from the following: (1) difficulty sleeping at night, (2) needing a nap during the day and dosing off due to chronic fatigue, (3) being accompanied by her husband driving any distance or having to use a GPS to avoid getting lost, and (4) only performing an hour of household work (*e.g.*, laundry and

taking out trash) and needing to take breaks while performing such work. (AR 1357-64.) Taken as a whole, the Court does not find that Plaintiff's Questionnaire constitutes substantial evidence to warrant Plaintiff's termination of benefits.[20] *See Strott v. Dimensional Inv., LLC Health & Welfare Plan*, Civ. No. 13-1245, 2015 WL 1299773, at *10 (W.D. Pa. Mar. 23, 2015) (finding that the defendant's decision reversing the initial termination of benefits was arbitrary and capricious because the defendant's decision was not based on substantial evidence). Rather, it appears that Defendant cherry-picked portions of the Questionnaire that favored termination without acknowledging aspects of the Questionnaire that would provide a more fulsome picture of Plaintiff's disability. *See Kosiba*, 2011 WL 843927, at *12 ("'[S]elective readings' of the evidence that are 'not reasonably consistent with the entire picture' is 'another hallmark of an arbitrary and capricious decision.'" (*Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 777 (7th Cir. 2010))). Therefore, because the Court finds that Defendant did not rely on "any meaningful evidence to support a change in position" regarding Plaintiff's physical disability, Defendant's "abrupt reversal is cause for concern that weighs in favor of finding that its termination decision was arbitrary and capricious." *See Miller*, 632 F.3d at 849.

The Court also finds that Defendant failed to address Plaintiff's cognitive disability in its initial decision to terminate benefits as of April 29, 2023. (*See* AR 0380-84.) Based on the Court's review of the record, it is clear that Plaintiff's claim for disability stemmed from both physical and cognitive issues and that throughout the relevant timeframe leading up to termination, Defendant

---

[20]    Defendant's reliance on *Wernicki-Stevens v. Reliance Standard Life Ins. Co.*, 641 F. Supp. 2d 418, 426-27 (E.D. Pa. 2009), is unavailing. In *Wernicki-Stevens*, the court found that the defendant's reliance on the plaintiff's functional capacity evaluation (FCE) to terminate benefits was proper because the FCE demonstrated that the plaintiff was able to "exert 'maximal effort' during the course of a two-day exam and was capable of full time sedentary work, so long as certain restrictions were imposed." *Id.* at 427.

did acknowledge and consider Plaintiff's cognitive concerns as part of its decisions to continue disability benefits.  (*See* SMF ¶ 18; XSMF ¶ 36-39; AR 0147-49.)  However, Defendant's May 2, 2023 letter refers only to Plaintiff's physical impairments, and there is no mention of any evidence that would contradict Dr. Van Gorp's findings of a cognitive impairment.  (*See* AR 0693-701 (outlining Plaintiff's cognitive impairments based on Dr. Van Gorp's neuropsychological evaluation).)  Therefore, Defendant's failure to consider Plaintiff's cognitive impairments when such impairments were part of Plaintiff's claim and diagnosis weighs in favor of finding that Defendant's decision was arbitrary and capricious.  *See Miller*, 632 F.3d at 853 ("An administrator's failure to address all relevant diagnoses in terminating a claimant's benefits is also a cause for concern that suggests the decision may have been arbitrary and capricious.").

Based on the foregoing, Defendant's decision to terminate Plaintiff's benefits weighs in favor of a finding that Defendant's decision was arbitrary and capricious.  *See Connor v. Sedgwick Claims Mgmt. Servs., Inc.*, 796 F. Supp. 2d at 588 (weighing the defendant's decision to abruptly terminate the plaintiff's benefits heavily in favor of finding that the defendant's termination decision was arbitrary and capricious).

## 2. *Non-Treating versus Treating Physicians*

Plaintiff argues that Defendant's failure to "offer a reasonable basis for departing from the findings and conclusions of" Drs. Levine and Van Gorp "renders [Defendant's] decision arbitrary, capricious, and wrong."  (ECF No. 19-1 at 27-30.)  Defendant argues that it was under no obligation to accord greater weight to Plaintiff's treating physicians as opposed to the non-treating physicians in this case.  (ECF No. 18-13 at 25-26.)

"It is well-settled that ERISA plan administrators are not obligated to give special deference to a claimant's treating physician and that they are justified in relying on the opinions

37

of their own consulting physicians without explaining their decision to do so." *Addington v. Senior Vice President-Hum. Res., Consol Energy, Inc.*, Civ. No. 17-444, 2019 WL 3416098, at *6 (W.D. Pa. Mar. 15, 2019), *report and recommendation adopted*, 2019 WL 3414285 (W.D. Pa. July 29, 2019), *aff'd*, 841 F. App'x 443 (3d Cir. 2020); *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (holding that "plan administrators are not obliged to accord special deference to the opinions of treating physicians"); *Stratton v. E.I. DuPont De Nemours & Co.*, 363 F.3d 250, 258 (3d Cir. 2004) (holding that in the ERISA context, "[a] professional disagreement does not amount to an arbitrary refusal to credit"). The "[p]laintiff must produce evidence sufficient to convince the [c]ourt that [the] [d]efendant's deference to the opinions of the reviewing physicians, as opposed to [the] [p]laintiff's treating physicians, was unreasonable or unsupported by substantial evidence." *Matteo v. Reliance Standard Life Ins. Co.*, Civ. No. 18-11450, 2022 WL 819600, at *10 (D.N.J. Mar. 17, 2022). Moreover, "[a]lthough an administrator may not 'refuse to credit a claimant's reliable evidence' (which includes the opinion of a treating physician), the administrator may credit 'reliable evidence that conflicts with a treating physician's evaluation.'" *Id.* (quoting *Black & Decker*, 538 U.S. at 834). And "plan administrators are under no 'discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.'" *Id.*

Although Defendant was under no obligation to accord greater deference to Drs. Levine and Van Gorp, Defendant's decision to rely heavily on Drs. Palermo and Erdos (*i.e.*, the non-treating physicians) is concerning based on the record before the Court. As for Dr. Palermo, he concluded that "the medical information does not support any functional limitations sufficient to preclude working from 04/29/2023 ongoing" and that "[a] normal exertional level is possible." (AR 3194-3195.) However, as to Plaintiff's physical impairments, Dr. Palermo's report (*see* AR

3189-3199, 3254-56) fails to even consider the objective findings of Dr. Keller. Dr. Keller performed Plaintiff's CPET and concluded that Plaintiff was "not able to produce sufficient energy to perform sedentary work on a sustained basis without exacerbating her already severe symptom complex" and that "[t]he collective results of this test indicate that [Plaintiff's] ability to carry out normal daily activities is limited and renders her unable to perform even sedentary-level work on a sustained basis." (AR 0592.) And as to Plaintiff's cognitive impairments, Dr. Palermo does not address Dr. Van Gorp's cognitive findings, but rather challenges Dr. Levine's findings, an infectious disease specialist, for her failure to provide any objective evidence of a cognitive impairment.[21]    (*Id.* at 3196, 3255; *see id.* at 3197 (acknowledging Dr. Van Gorp's neuropsychological evaluations from 2021 and 2023, agreeing that Plaintiff is suffering from a cognitive impairment, but offering a conclusion that there is no additional support in the record to find Plaintiff is cognitively disabled from performing her job by rejecting Dr. Levine's findings).) Moreover, Dr. Palermo's extensive reliance on Dr. Levine's alleged failure to provide objective evidence cannot be accorded much weight in light of the Court's earlier findings that the lack of objective evidence was not new, meaningful evidence that warrants terminating benefits. Therefore, Defendant crediting Dr. Palermo's opinions over Plaintiff's treating physicians is suspect. *See Clauss v. Plan*, 196 F. Supp. 3d 463, 472 (M.D. Pa. 2016) (concluding that the

---

[21]    The Court notes that Dr. Gilson, a neurologist, did indicate normal cognitive findings. However, Dr. Gilson's report was only provided in July 2023, after Defendant made the initial decision to terminate benefits, which is a consideration that weighs in favor of finding that extensive reliance on Dr. Gilson's report is arbitrary and capricious. *See Funk v. CIGNA Grp. Ins.*, 648 F.3d 182, 191 n.11 (3d Cir. 2011) (noting that while "[a] plan administrator's final . . . decision should be the focus of review," courts "may of course consider a plan administrator's pre-final decisions as evidence of the decision-making process that yielded the final decision, and it may be that questionable aspects of or inconsistencies among those pre-final decisions will prove significant in determining whether a plan administrator abused its discretion"). Moreover, Dr. Gilson's findings are not substantial when viewed against the record as a whole.

defendant did not offer a reasoned explanation for its decision to reject the opinions by the plaintiff's treating physicians and instead relied on independent medical reviewers that offered opinions contradicting and ignoring the plaintiff's medical record); *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261, 289 (W.D. Pa. 2008) (finding that the plan administrator improperly relied on non-treating physicians given omissions and misinterpretations from the non-treating physicians).

As to Dr. Erdos, it is unclear how Defendant could credit Dr. Erdos' opinions, rendered from a psychiatric perspective, when Plaintiff's disability is both physical and cognitive in nature. Indeed, based on the Court's review of Dr. Erdos' reports, Dr. Erdos does not appear to disagree or dispute Dr. Van Gorp's findings of cognitive impairment.  (*See id.* at 3182-87, 3250-51.)  *See also Ward v. Reliance Standard Life Ins. Co.*, Civ. No. 23-2147, 2024 WL 3206709, at *10 (D. Md. June 21, 2024) (finding that Dr. Erdos' opinion failed to "contain evidence relevant to [the] [p]laintiff's ability to meet the cognitive functioning requirements of her regular occupation," and finding that the word "cognitive" only appeared in Dr. Erdos' report in the summary of medical records).  Moreover, it is unclear from the record that Dr. Erdos, a psychiatrist, is even qualified to render an opinion on Plaintiff's cognitive impairments.[22]  *See Morgan v. UNUM Life Ins. Co. of Am.*, 346 F.3d 1173, 1178 (8th Cir. 2003) (finding that in the context of ERISA disability benefits, the defendant's in-house physician was not qualified to opine on the claimant's disorder

---

[22]    Defendant relies on *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 86 (2d Cir. 2009) for the proposition that Dr Erdos was qualified as a psychiatrist to opine on Plaintiff's cognitive impairment.  (ECF No. 27 at 41.)  In *Hobson*, the Second Circuit determined that the reports from two psychiatrist consultants supported a finding that the plaintiff was not cognitively impaired.  *Id.* at 89.  The Court finds *Hobson* distinguishable from the present matter.  First, the two psychiatrists in *Hobson* clearly considered whether Plaintiff was cognitively disabled, whereas Dr. Erdos did not and merely found that the records reviewed suggested a cognitive impairment.  Second, it does not appear that any neuropsychological evaluation was conducted in *Hobson*.  Conversely, Plaintiff underwent two neuropsychological examinations.

of fibromyalgia, and that the in-house counsel's opinion was indirectly related to the plaintiff's cognitive deficits).  As a result, because Dr. Erdos' findings related to Plaintiff's psychiatric condition is at most tangentially related to Plaintiff's cognitive issues, the Court likewise finds that Defendant has appeared to improperly accord greater deference to a non-treating physician.

Based on the foregoing, Defendant's decision to accord greater weight to non-treating physicians weighs in favor of a finding that Defendant's decision was arbitrary and capricious.

### 3.  Self-Serving Selectivity in the Use of Evidence

Plaintiff argues that Defendant's adverse benefits determination is the product of a self-serving, selective review of the evidence.  (ECF No. 19-1 at 30-34; ECF No. 28 at 8-9.)  The Court agrees.

"[A] self-serving selectivity in the use of evidence or reliance on self-serving paper reviews of medical files" is a procedural anomaly that can lead to a finding that a plan administrator's decision to terminate benefits was arbitrary and capricious.  *Kosiba*, 2011 WL 843927, at *10. This means that "[a]n administrator may not selectively consider and credit medical opinions without articulating its thought processes for doing so."  *Id.* at *12 (quoting *Ricca v. Prudential Ins. Co. of Am.*, Civ. No. 08-257, 2010 WL 3855254, at *7 (E.D. Pa. Sept. 30, 2010)).  A plan administrator may be liable for performing a selective review if it emphasizes "a certain medical report that favored a denial of benefits, . . . deemphasize[s] certain other reports that suggested a contrary conclusion, and . . . fail[s] to provide its . . . medical experts with all of the relevant evidence."  *Glenn*, 554 U.S. at 118; *Kosiba*, 2011 WL 843927, at *12 ("'[S]elective readings' of the evidence that are 'not reasonably consistent with the entire picture' is 'another hallmark of an arbitrary and capricious decision.'" (*Holmstrom*, 615 F.3d at 777)).  Moreover, "inconsistent treatment of the same authority in two separate instances," such as crediting one part of the advice

41

of a treating doctor, but not that doctor's other advice, may be indicative of a selective review. *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 394 (3d Cir. 2000), *as amended* (July 19, 2000).

Plaintiff asserts that Defendant selectively reviewed the record by ignoring Dr. Levine's objective findings, cherry-picking specific information from Plaintiff's Daily Activities Questionnaire that favored termination without acknowledging information that supported a continuation of benefits, and not relying on adequate records to support a finding that Plaintiff was not cognitively disabled.  (ECF No. 19-1 at 30-34.)  As the Court has already outlined, Defendant failed to consider Dr. Levine's records as a whole—which frequently provided objective findings and assessments for Plaintiff's physical disability and work limitations—and certainly cherry-picked aspects of the Questionnaire that favored termination.  Moreover, Defendant relied on medical records, such as Drs. Palermo and Erdos, to show Plaintiff was not cognitively disabled even though these physicians either agreed that Plaintiff was cognitively impaired or were unqualified to render a decision on whether Plaintiff suffered from a cognitive impairment.

Based on the foregoing, Defendant's selective use of evidence in the record weighs in favor of finding that Defendant's decision was arbitrary and capricious.

### 4.  Job Requirements

"[A]n administrator's proper consideration of the claimant's ability to perform his or her job requirements in light of the relevant diagnosis is a significant factor to evaluate on arbitrary and capricious review."  *Miller*, 632 F.3d at 854.  "Even where a vocational analysis is not a requirement of a claim determination under a plan, a '[d]efendant is still obligated under ERISA to provide a well-reasoned explanation of its decision including which sedentary jobs [the] [p]laintiff is capable of working, with or without accommodations."  *Kosiba*, 2011 WL 843927, at

*14 (quoting *Dunn v. Reed Grp., Inc.*, Civ. No. 08-1632 FLW, 2009 WL 2848662, at *11 (D.N.J. Sept. 2, 2009)). Here, Defendant failed to give a reasoned evaluation of Plaintiff's ability to perform the material and substantial duties of her job.

Prior to becoming disabled, Plaintiff worked as Executive Director of Corporate/Procurement Services at Sumitomo. (XSMF ¶ 12; AR 532.) Plaintiff's key duties were to: (1) "Improve vendor/supplier governance and performance management"; (2) "Centralize and automate back-office procurement, contract management and invoicing operations"; (3) "Reduce vendor/supplier related legal, regulatory, financial and operational risk to the Firm"; (4) "Drive significant and sustainable savings across businesses"; and (5) "Maximize visibility and control of vendor/supplier spend across business and regions." (XSMF ¶ 13; AR 665-66 (outlining the scope, primary responsibilities, and core competencies of Plaintiff's job).) Plaintiff's job was sedentary and involved "directing, controlling, or planning activities of others" and "making judgments and decisions." (SMF ¶ 16; AR 1121.) And under the LTD Policy, Defendant will look at the insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale. (SMF ¶ 15.)

Regarding the initial decision to terminate Plaintiff's benefits, Defendant advised that:

> Based on the review of medical records there were no clinical findings to support a severity of symptoms to preclude sedentary work function. While symptoms are noted, there is no clinical documentation to support that [Plaintiff] is precluded from sedentary work function or that her symptoms preclude safe sedentary work function.
>
> . . . .
>
> A Vocational Rehabilitation Specialist has reviewed and considered all relevant information in [Plaintiff's] claim file and determined that her occupation is classified as sedentary. [Plaintiff's] claim for benefits has been evaluated based on her ability to perform a sedentary occupation, which requires the ability

> to lift/carry and push/pull up to a minimum of 10 pounds and is performed primarily from a seated position but may require occasional standing or walking. Given these facts, we have determined that [Plaintiff] does not meet the group policy's definition of Total Disability and her claim must be denied.

(AR 0382.)  As to the decision affirming the initial termination, Defendant stated the following:

> While we acknowledge that [Plaintiff] is continuing to receive treatment for several medical conditions, documentation on file does not support ongoing impairment which supports a lack of fulltime consistent work function.  Cognitive and neurological exams appear as normal, and medical information on file does not document functional limitations which preclude work function. Therefore, in conclusion, based on the medical records, the independent physician's review and other information within [Plaintiff's] claim file, we determined that her condition was not of such a severity to render her unable to perform the material duties of [her] Regular Occupation on a full-time basis beyond April 29, 2023.

(*Id.* at 0433.)

Even though Defendant determined that Plaintiff was not disabled, Defendant arrived at this conclusion without considering whether Plaintiff could actually perform her duties as Executive Director of Corporate/Procurement Services.  Indeed, there is no mention of Plaintiff's job requirements in determining that Plaintiff could perform sedentary work in light of her physical disability.  *See Heim v. Life Ins. Co. of N. Am.*, Civ. No. 10-1567, 2012 WL 947137, at *12 (E.D. Pa. Mar. 21, 2012) (finding that it is a "significant oversight that [the plan administrator's] termination decision was not reasoned and based on an individualized assessment of her abilities") (citation modified); *Strott*, 2015 WL 1299773, at *18 (finding that the defendant failed to conduct an objective analysis as to whether the plaintiff was capable of performing his job duties).

Moreover, Defendant never addressed whether Plaintiff could perform the cognitive duties of her job.  For example, there is no explanation as to how Plaintiff's ability to "lift/carry and push/pull up to a minimum of 10 pounds" from a seated position meaningfully refutes Dr. Van

Gorp's findings that Plaintiff's "position as Executive Director . . . required a high degree of cognitive demand, including strong attentional and executive functioning Skills, and oral and written communication skills," and that "[b]ased on the results of [Plaintiff's] evaluation, together with her physical challenges," she "is unable to work due to her cognitive" impairment." (AR 1809.) Defendant argues that Plaintiff's job is not "cognitively demanding" and only requires reasoning at a "9th to 12th grade level." (ECF No. 33 at 19.) However, Plaintiff's job description indicates that the job is intellectually demanding, requiring Plaintiff to reduce operational risk to the company, plan activities of others, make judgments and decisions, and drive significant and sustainable savings across the business. Given Plaintiff's job description and the unrebuked findings of Dr. Van Gorp, Defendant's decision that Plaintiff could perform sedentary work and therefore perform her job is not supported by substantial evidence that a reasonable mind would accept as true. *See Miller*, 632 F.3d at 854 (finding that the defendant failed to consider whether the plaintiff could actually perform his job duties as a pilot without an explanation of "how his claimed anxiety and latent risk of psychosis would be compatible with this uniquely stressful position").

Therefore, the Court finds that Defendant's failure to consider whether Plaintiff could perform her job is a significant oversight that suggests the decision was arbitrary and capricious.[23]

### 5. *Social Security Benefits*

Plaintiff argues that Defendant offered "no meaningful explanation for why it discounted Plaintiff's Social Security Disability award." (ECF No. 19-1 at 34.) Defendant counters that "[t]he

---

[23]    To the extent it was relevant for Defendant to determine whether Plaintiff could perform any sedentary job, Defendant has also failed to do so. Defendant's analysis of Plaintiff's ability to perform any sort of job function is simply too vague and unclear to thwart a finding that Defendant's decision to terminate benefits was arbitrary and capricious.

award of Social Security Disability benefits is not determinative" and is merely a factor that a court may consider in determining whether it's decision was arbitrary and capricious.  (ECF No. 18-13 at 37.)

"While an SSA award may be considered as a factor in determining whether an ERISA administrator's decision to deny benefits was arbitrary and capricious, it 'does not in itself indicate that an administrator's decision was arbitrary and capricious, and [] a plan administrator is not bound by the SSA decision.'"  *Brandeburg v. Corning Inc. Pension Plan for Hourly Emps.*, 243 F. App'x 671, 674 (3d Cir. 2007) (quoting *Dorsey v. Provident Life & Accident Ins. Co.*, 167 F. Supp. 2d 846, 856 n. 11 (E.D. Pa. 2001)); *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x 266, 269 (3d Cir. 2006) (same).  This is so because "[t]he legal principles controlling the Social Security analysis differ from those governing the ERISA analysis, and, thus, the SSA's determination of disability is not binding on an ERISA benefit plan."  *Connor*, 796 F. Supp. 2d at 585.

While "the Social Security analysis is not binding, the decision is to be considered when the plan administrator" does the following: (1) "encourages the applicant to apply for social security disability payments"; (2) "financially benefits from the applicant's receipt of Social Security"; and then (3) "fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious."  *Menes v. Chubb & Son*, 101 F. Supp. 3d 427, 436 (D.N.J. 2015) (quoting *Connor*, 796 F. Supp. 2d at 585).

Here, the record is clear that Defendant encouraged Plaintiff to apply for social security disability and that Defendant benefitted from Plaintiff's receipt of such benefits.  However, Defendant provided adequate justification as to why it took a different position from that of the

SSA:

> While [Defendant] consider[ed] Social Security and other insurers' determinations, they are not binding on [Defendant's] decision as to whether or not [Plaintiff] meets the definition of Total Disability, as set forth in [the] Policy. A person's entitlement to each of these benefits may be based upon a different set of guidelines, which may sometimes lead to differing conclusions. In addition, each benefit provider may also be considering different medical evidence in the evaluation of a claim. For example, in her situation, the [SSA] did not have the results of [Defendant's] medical and vocational information [Defendant] may have developed in her file, which stated, "No. Based on my review of medical information, the medical information does not support any functional limitations sufficient to preclude working from 04/29/2023 ongoing. A normal exertional level is possible." If the SSA were to review this report along with the other medical information obtained by [Defendant], they may reach a similar conclusion. In any event, the receipt of SSDI benefits does not guarantee the receipt of LTD benefits or vice versa.

(AR 0434.) Because Defendant did not simply ignore the award of social security benefits, but rather provided reasons why such decision did not impact Defendant's determination to deny disability benefits, the Court finds that it was not arbitrary and capricious for Defendant to not credit Plaintiff's award of social security benefits. *See Breen v. Reliance Standard Life Ins. Co.*, Civ. No. 22-3688, 2023 WL 6396051, at *13 (E.D. Pa. Oct. 2, 2023) (noting that because "there is no explanation as to SSA's reason for awarding benefits in the [a]dministrative [r]ecord, and [because the] [d]efendant specifically mentioned the SSA's award of benefits in its denial, [the] [d]efendant did not ignore the SSA's decision but adequately addressed the decision in light of the facts it had available. Accordingly, because the burden of proof to prove disability belongs to [the] [p]laintiff, [the] [d]efendant's decision was not arbitrary and capricious simply because it did not find the same way SSA did."); *Reichard v. United of Omaha Life Ins. Co.*, 331 F. Supp. 3d 435, 473 (E.D. Pa. 2018), *aff'd*, 805 F. App'x 111 (3d Cir. 2020) ("[A] plan administrator's denial of benefits is not arbitrary and capricious, SSD award notwithstanding, when there is evidence that

the SSA based its determination on a distinguishable record."); *Kosiba*, 2011 WL 843927, at *18 (noting that a plan administrator's "rejection of an SSD decision [is] permissible in an ERISA termination context where, for example, the two definitions of disability differ, the SSA decision was made on differing medical evidence, or the two determinations were far apart in time"); *Alford v. Hartford Life Ins. Co.*, Civ. No. 07-4527, 2008 WL 2329101, at *8 (E.D. Pa. June 3, 2008) ("The SSA determination by itself, however, does not prove [the defendant] denied [the plaintiff's] claim arbitrarily and capriciously. Standards for disability under [the defendant's] plan and Social Security differ, and the SSA cannot be held against [the defendant].").

The Court, therefore, finds that Defendant's refusal to give weight to Plaintiff's award of social security benefits was not arbitrary and capricious.

Based on the Court's review of the voluminous record in this case, the Court finds that despite the deferential standard that applies, the procedural irregularities and substantive errors on Defendant's part compels the Court to conclude that the decision to terminate Plaintiff's benefits was arbitrary and capricious.[24] *See Smith*, 2010 WL 456779, at *7 ("While there is unquestionably evidence in the administrative record that could support the interpretation that Plaintiff advocates, as aforestated it is not [this Court's] task to decide whether a different result could have been reached" but "[r]ather, . . . whether [Defendant's] denial of LTD benefits was arbitrary and capricious.").

## C. Remedy

Having found that Defendant's decision to terminate benefits was arbitrary and capricious,

---

[24]    Because the Court has determined that Plaintiff has satisfied her burden that she was disabled and that Defendant's decision was arbitrary and capricious, the Court will deny Defendant's Motion for Summary Judgment for the reasons outlined throughout this opinion. *See Wernicki*, 641 F. Supp. 2d at 429 (granting in part and denying the defendant's motion for summary judgment based on the court's reasoning in granting the plaintiff's motion for summary judgment).

the Court must determine the appropriate remedy. Plaintiff argues that the appropriate remedy is reinstatement of benefits. (ECF No. 19-1 at 36-37.) Defendant has not taken a position on what the appropriate remedy should be in this case.

The Third Circuit has recognized that "[i]n a situation where benefits are improperly denied at the outset, it is appropriate to remand to the administrator for full consideration of whether the claimant is disabled" because "[t]o restore the status quo, the claimant would be entitled to have the plan administrator reevaluate the case using reasonable discretion." *Miller*, 632 F.3d 837, 856-57. However, "[i]n the termination context, . . . a finding that a decision was arbitrary and capricious means that the administrator terminated the claimant's benefits unlawfully" and "[a]ccordingly, benefits should be reinstated to restore the status quo." *Id.* at 857.

Here, Defendant approved Plaintiff's LTD and GLI benefits on January 3, 2022. On May 2, 2023, Defendant terminated Plaintiff's benefits, finding that she was no longer disabled as of April 29, 2023. Because Plaintiff's benefits were unlawfully terminated, in order to return her to the status quo, the Court must retroactively reinstate her benefits from April 29, 2023, to November 21, 2023. *See Patterson v. Aetna Life Ins. Co.*, Civ. No. 15-8156, 2017 WL 4786562, at *12 (D.N.J. Oct. 23, 2017), *aff'd*, 763 F. App'x 268 (3d Cir. 2019) (finding that retroactive reinstatement of the plaintiff's benefits was necessary because the defendant's decision to terminate benefits was arbitrary and capricious). However, because there is no information in the record concerning Plaintiff's conditions following Defendant's denial of her appeal, the case is remanded for a determination as to whether Plaintiff remained disabled after November 21, 2023. *See Connor*, 796 F. Supp. 2d at 591 (retroactively reinstating benefits and remanding case issue to the plan administrator for a determination of whether the plaintiff was entitled to LTD benefits with respect to the period postdating the plan administrator's final decision terminating benefits);

*Pesacov v. Unum Life Ins. Co. of Am.*, 463 F. Supp. 3d 571, 584 (E.D. Pa. 2020) (same).

Therefore, the Court retroactively reinstates Plaintiff's benefits from April 29, 2023, to November 21, 2023, and remands this case for a determination as to whether Plaintiff may continue to receive disability benefits post-November 21, 2023.

## IV.  <u>CONCLUSION</u>

For the reasons stated above, and for other good cause shown, Defendant's Motion for Summary Judgment is **DENIED** and Plaintiff's Motion for Judgment or alternatively Motion for Summary Judgment is **GRANTED**.  An appropriate Order follows.

Dated: September 5, 2025

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

50